**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRUCE K. SIDDLE and SANDRA K. SIDDLE, individually and as trustees of the Bruce K. Siddle and Sandra K. Siddle trusts, dated July 16, 2003, and PPCT MANAGEMENT SYSTEMS, INC.,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:09-0175** |
| **v.** | ) ) | **Judge Trauger** |
| **DOCTOR R. CRANTS, JR., DOCTOR R. CRANTS, III,, LINDA COOPER, GEORGE V. CRAWFORD, III, LEE F. BOOTH, and ROY W. OAKS,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pending before the court is a Motion to Dismiss the First Amended Complaint filed by defendant Doctor R. Crants, Jr. (Docket No. 150), and a Motion to Dismiss the First Amended Complaint filed by defendant Doctor R. Crants, III (Docket No. 156)  For the reasons discussed herein, Crants, Jr.'s motion will be denied, and Crants III's motion will be denied in part.  In order to rule on the remainder of Crants III's motion, further briefing will be required.

**FACTUAL AND PROCEDURAL BACKGROUND**

The plaintiffs' operative Complaint in this case is seventy-seven pages (with attachments), but it is not necessary to recount each and every allegation in order to gain an understanding of the merits of the defendants' motions here.  That said, the court will recount the pertinent allegations, which come from the Amended Complaint (Docket No. 6).

1

From October 2001 thru October 2006, defendant Crants, Jr. was the Chairman, CEO and majority shareholder of Homeland Security Corporation (HSC). In 2003, his son, defendant Crants, III, acquired five percent ownership of HSC. During this time period, Crants, Jr. and Crants, III owned and controlled various other entities ("Related Parties"), such as Pharos Homeland and Pharos Homeland Financial, which carried on business with HSC.

The relevant events in this case were sparked by the terrorist attacks of September 11, 2001. Shortly after those attacks, Crants, Jr. incorporated HSC, an entity that would, among other things, compete for government contracts such as those offered by the Transportation Security Administration (TSA) to assist in the training of TSA employees on new security protocols.

On December 1, 2001, HSC entered into a joint venture with PPCT Management Systems (a plaintiff in this case). Plaintiff Bruce Siddle ran PPCT at this time, apparently as the sole or majority shareholder. The joint venture was formed to compete for a $106,000,000 TSA contract, which was awarded to the joint venture on April 20, 2002. Although the precise timing is not completely clear from the Amended Complaint, after the contract was awarded, the joint venture dissolved when Mr. Siddle transferred his interest in PPCT to HSC in exchange for Crants, Jr's promise of 25 percent ownership in HSC and cash. (Docket No. 6 at 20, 22.) Through this transaction, Mr. Siddle became, along with Crants, Jr., a member of the HSC Board of Directors. Near this time, the Board was apparently expanded to three members to include Joseph Johnson, Jr. PPCT is now a wholly owned subsidiary of HSC. (Docket No. 10.)

The plaintiffs allege that, from October 2001 to October 2006, both Crants, Jr. and Crants, III were operating an elaborate scheme that was designed to, and did, defraud the

plaintiffs by taking their business and property interests under false pretenses. While the Amended Complaint alleges numerous manifestations of this broad plan, three devices are particularly prominent in the allegations. First is the "demand note" scheme, through which, in one manifestation, the plaintiffs contend that Crants, Jr. and Crants, III agreed to misrepresent to the public, the Siddles, and various banks that HSC had issued a $5,000,000 promissory note to one of the Pharos entitles controlled by Crants, III, when, in fact, no such note had been issued. The plaintiffs allege that this misrepresentation (and those connected to similar fraudulent demand notes) allowed Crants, Jr and Crants, III to deem HSC cash transactions with them or a Related Party a payment on the note, which allowed them to maintain control over HSC's cash and avoid various reporting requirements. When "due diligence" investigations were conducted with HSC and the relevant notes were requested, the plaintiffs allege that Crants, Jr. and Crants, III simply agreed to draw up a fraudulent note.

Second is the "stock redemption" scheme, by which the plaintiffs allege that Crants, Jr. repeatedly (on four specific occasions) redeemed his HSC common stock with HSC for $60 per share, which was the value that Crants, Jr claimed the stock had. The plaintiffs allege that Crants, Jr. told HSC that he needed the cash to repay "loans," when, in fact, no loans existed. The plaintiffs contend that the stock redemption technique was Crants, Jr.'s way of paying himself (but not the plaintiffs or any other HSC shareholder) a dividend and his way of simply taking cash from HSC, without approval from the Board of Directors, including Mr. Siddle.

Third is the "Fraudulent Factoring for Hidden Related Party Payments Device," by which Crants, Jr. (without consultation with others at HSC) caused HSC to enter into a high interest rate factoring agreement with a financial institution. Through the factoring agreement, the

3

financial institution paid HSC (through Crants, Jr.) a cash advance in exchange for a high interest rate and a security interest in HSC's accounts receivable.  The plaintiffs allege that Crants, Jr. kept the advance payment for himself (or funneled it to a Related Party directed by Crants, III) and left HSC with the problem of paying back the high interest rate loan, which further drained HSC of cash.  In sum, the plaintiffs allege that Crants, Jr. (often assisted by his son) used all three of these schemes to enhance his personal wealth, while draining HSC of cash, and, further, that Crants, Jr. and Crants, III covered up and lied about their schemes to employees of HSC, the plaintiffs, and entities such as the IRS.

In addition to each of these schemes, the plaintiffs allege that, throughout the entire course of their relationship, Crants, Jr. (often with the aid of his son) acted in a dishonest manner toward the plaintiffs.  Among other things, the plaintiffs allege that Crants, Jr: (1) at the outset of their relationship, lied about the expansive and controlling role that the Siddles would play at HSC; (2) used Johnson as a pawn on the Board of Directors to "improperly affirm Crants' self-dealing at HSC"; (3) diluted the Siddles' 25 percent interest in HSC by issuing "warrants" to friendly interests; (4) lied about the value of the plaintiffs' HSC stock, the company's future prospects, and the future benefits that the Siddles would receive from HSC, with this pattern of behavior particularly remarkable at the time of the dissolution of the joint venture; (5) failed to pay dividends to the Siddles despite their ownership interest; (6) repeatedly lied about the true financial condition of HSC and covered up the related party transactions and self-dealing maneuvers that were draining HSC of cash. The plaintiffs allege that, by October 2006, this pattern of scheming and deception placed HSC  "near or at insolvency."

The plaintiffs allege that, in 2005, Michael Webb, Treasurer of HSC, informed Mr.

Siddle that Crants, Jr. had been embezzling money and essentially using the HSC check book as his personal check book. The plaintiffs allege that, over the next year, with Mr. Siddle pressuring Crants, Jr. on the embezzlement issue, Crants, Jr. used various heavy-handed maneuvers in an attempt to drive Mr. Siddle away from HSC, including threatening to remove him from the Board of Directors and to withhold his salary. In April 2006, in the course of this acrimony, HSC, Mr. Siddle, and Crants, Jr. signed a Release Agreement, by which the parties agreed to mutually release and settle "all claims" that the parties have "against one another arising from certain disputes between the parties." (Docket No. 152 Ex. 2.) The plaintiffs allege that the consideration for this release was supposed to be the transfer of 80,000 shares of HSC stock to the Siddles, but that these shares were never delivered. The plaintiffs allege that, despite the release, Crants , Jr continued to threaten Mr. Siddle with the withholding of wages and with his removal from the Board of Directors. Indeed, the Siddles allege that their wages were withheld from August 2006 to October 2006. Further, the plaintiffs allege that, in October 2006, Crants, Jr. threatened to bankrupt HSC unless Mr. Siddle bought HSC and agreed to give up the right to sue Crants, Jr. once and for all.

In this acrimonious environment, in October 2006, in exchange for about $5,000,000 in notes and cash, Mr. Siddle purchased Crants, Jr.'s stock in HSC, and Crants Jr's association with HSC thereby ended. As part of this transaction, the parties signed another release agreement, in which Crants, Jr., HSC and Mr. Siddle once again purported to release "any and all actions, claims, demands ... that may have existed or occurred prior to the date of [the agreement] ... whether such actions, claims, and demands are currently known or unknown, disclosed or undisclosed, or are accrued or unaccrued." (Docket No. 152 Ex. 3.)

In December 2006, once Mr. Siddle had full access to HSC's files, the plaintiffs allege that Mr. Siddle began to realize the scope of the fraud, and the plaintiffs contend that they are still attempting to discover the damage caused. They claim that their "business and property interests," particularly their interests in certain patents, copyrights, and trademarks, as well as various other professional and financial interests, have been damaged by the fraud.

On October 28, 2008, the plaintiffs filed their Amended Complaint, in the Southern District of Illinois. Various defendants filed motions asserting that the venue was improper, and, on February 17, 2009, this case was transferred to this court pursuant to 28 U.S.C. § 1406. Since that time, the two pending motions to dismiss, brought under Fed. R. Civ. P. 12(b)(6), have been filed. (Docket Nos. 93, 150, 156.)

## ANALYSIS

The plaintiffs claim that defendant Crants, Jr. violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.§ 1962(a)-(d), (counts 1-4), violated various federal securities laws (count 5), injured Mr. Siddle's business reputation in violation of federal law embodied in 15 U.S.C. § 1125 (count 6), violated various Illinois statutes that prohibit unfair, deceptive and oppressive business practices (counts 7-9), breached his fiduciary duty toward the plaintiffs (count 10), tortiously interfered with the plaintiffs' business relationships (count 11), was unjustly enriched (count 12), engaged in fraudulent misrepresentation (count 13) and intentional fabrication and spoliation of evidence (count 14), unlawfully converted the plaintiffs' property (count 15), and engaged in an illegal conspiracy (count 19). The plaintiffs also assert a claim of constructive trust (count 16). As to Crants, III, the plaintiffs assert count 4 (RICO conspiracy), count 8 (Illinois Unfair Business Practices statute), count 9 (Illinois

6

Deceptive Business Practice statute), along with counts 11-15, and 19.  Crants, Jr. and Crants, III have filed separate motions to dismiss under Fed. R. Civ. P. 12(b)(6).

## I.     Standard of Review (Motion to Dismiss)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236.  Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the federal rules.  The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United*

7

*Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a "showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by "blanket assertion[s]." *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 1965; *see also Swierkiewicz,* 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely").

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 2009 WL 1361536 (May 18, 2009), the Court further expounded on the "two working principles" that underlie the *Twombly* decision. *Id.* at 1949. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to a state a claim under the federal rules. *Id.* Second, "only a complaint that states a plausible claim for relief survives a

8

motion to dismiss." *Id.* at 1950. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949.

Further, the Court explained that determining "facial plausibility" is a "context-specific task," in which the reviewing court must "draw on its judicial experience and common sense." *Id.* at 1950. Where, using this background, the court finds that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. Rule Civ. Proc. 8(a)(2)). The Court noted that, "[i]n keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

## II.    Crants, Jr.'s Motion[1]

In his motion, Crants, Jr. argues (1) that the October 2006 release bars all claims asserted by the plaintiffs against him in this case, and (2) that, even if the release does not bar all claims,

---

[1] As to both Crants, Jr and Crants, III, the plaintiffs argue that "Judge Murphy denied the defendants' ... Rule 12 motions to dismiss ..." when he transferred the case to this court. (Docket No. 165 at 1; Docket No. 168 at 1.) That is not so. Judge Murphy transferred this case, but he did not reach the merits of the Rule 12(b)(6) motions filed by Crants, Jr and Crants, III. (See Docket No. 94.) Contrary to the plaintiffs' argument, there is, therefore, no "law of the case" as to these defendants' Rule 12(b)(6) motions, and it would be most unfair to the defendants to rule that they could not renew their Rule 12(b)(6) motions simply because the transferor court did not address those issues prior to granting the defendants' venue motions.

the plaintiffs do not have standing to assert a RICO claim against him in this case because they did not suffer a direct injury, as required.

### A.     The Release

Crants, Jr. seeks dismissal of the plaintiffs' Complaint against him primarily on the ground of release; that is, Crants, Jr. argues that the release agreements discussed above were intended to prevent exactly this type of litigation, were freely agreed to, and should be enforced. In support of this argument, while captioning his motion as a motion to dismiss, Crants, Jr. submitted various documents, including the release agreements.  (See Docket No. 152 Exs. 1-3.) Crants, Jr. argues that the submission of these documents does not convert the motion to dismiss into a motion for summary judgment.  (Docket No. 151 at 3.)  In support of this position, Crants, Jr. cites the *Greenberg* case, in which the Sixth Circuit concluded that such conversion does not take place when, in filing a motion to dismiss, the defendant also files a document or exhibit "referred to in the complaint and [] central to the plaintiff's claim."  (Docket No. 151 at 3 citing *Greenberg v. Life Ins. Co*, 177 F.3d 507, 514 (6th Cir. 1999)).

In response, the plaintiffs argue that the release agreements are certainly not "central to the plaintiff's claim," and, therefore, in light of these submissions, Crants, Jr.'s motion should be considered a motion for summary judgment. (Docket No. 165 at 11-13.)  After the plaintiffs submitted various exhibits and records in their response (Docket No. 165 Exs. 1-2), Crants, Jr. apparently conceded that this motion should be treated as a motion for summary judgment under Fed. R. Civ. P 56 (c), and Crants, Jr. submitted additional documentation "in support thereof." (Docket No. 174 at 2.)

Crants, Jr's release argument is fairly simple; that is, he argues that, because the broad,

all-encompassing October 2006 Release Agreement was effective as of the date of Crants, Jr.'s sale of his HSC stock to Mr. Siddle (which apparently took place at the end of October 2006), and because Crants, Jr. and the plaintiffs had no business association after that time, the Release Agreement must bar all claims against Crants, Jr in this case. (Docket No. 151 at 7.) The October 2006 release, as opposed to the April 2006 release, has been the primary focus of the briefing on this motion, presumably because the Amended Complaint makes a considerable number of allegations regarding Crants, Jr.'s misconduct after the April 2006 release was signed.

In his motion, Crants, Jr. argues that, to the extent that the plaintiffs assert that the October 2006 Release Agreement was the product of fraud, those fraud allegations were not stated "with particularity" in the Amended Complaint, as the Sixth Circuit requires that allegations of fraud include, at a minimum, "the time, place, and content of the alleged misrepresentation on which [plaintiffs] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." (Docket No. 151 at 9, citing *Sanderson*, *v. HCA*, 447 F.3d 873, 877 (6th Cir. 2006)). Crants, Jr. contends that, as to the October 2006 Release Agreement, the plaintiffs have stated none of these things in their Amended Complaint. (*Id.*)

Also, to the extent that the plaintiffs allege that the release was the product of extortion (the plaintiffs discuss extortion as a RICO predicate act in the Amended Complaint) based on the allegation that Crants, Jr. threatened to bankrupt HSC and withhold salary unless Mr. Siddle signed the October 2006 Release Agreement, Crants, Jr. contends that this allegation does not state a valid "extortion" claim, because a claim of extortion based upon the imposition of economic fear requires a showing that the alleged extortionist used this fear to obtain unlawful

11

objectives, and a stock sale does not qualify as an unlawful objective.  (Docket No. 151 at 10-11 citing *United States v. Enmons*, 410 U.S. 396, 400 (1973))

In response, the plaintiffs make two main arguments challenging the validity of the Release Agreement.  First, they argue that the release is not valid because of "failure of consideration," that is, Crants, Jr's stock certificates, which operated as consideration for the October 2006 (and April 2006) release, were fraudulent and "had the same effect as a phony deed to the Brooklyn Bridge."  (Docket No. 165 at 2.)  It is not necessary, for the reasons discussed below, to fully explore this issue.

Second, the plaintiffs argue that, at the time Mr. Siddle signed the October 2006 release, he "feared the harm Crants, Jr. illegitimately wielded against" him, and, therefore, the release was obtained "under false pretenses by fraud, deceit, and coercion."  (Docket No. 165 at 13, 17.)  Therefore, while the plaintiffs mentioned "extortion" in their Complaint, they are essentially arguing that the release should not be enforced because it was procured through sharp dealing and coercive tactics.  This allegation is clear from the Complaint; that is, from the Complaint, it can be easily adduced that the plaintiffs allege that Mr. Siddle had no choice but to sign the release, because otherwise Crants, Jr. was going to either drive HSC into bankruptcy (costing the plaintiffs their livelihood) or take some further action against the plaintiffs, such as withholding their salaries.  (Docket No. 6 at 13-14.)  Clearly, from the Complaint and the plaintiffs' response here, the plaintiffs have brought forth an argument that the release was only secured through economic coercion.

12

The defense of economic coercion or economic duress is, under Tennessee law[2], a valid defense to the enforcement of a contract, such as a release agreement. Indeed, "duress" is an "unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act ... contrary to his will and inclination." *Federal Deposit Ins. Corp. v. Ramsey*, 612 F. Supp. 326, 328 (E.D. Tenn. 1985). The alleged coercive event "must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a person of ordinary firmness." (*Id.*) "Economic duress" has been defined as "imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another. " *Crocker v. Schneider*, 683 S.W.2d 335, 338 (Tenn. App 1984). Such duress can serve as an effective defense to enforcement of a release, but it must be proved by "clear, cogent and convincing" evidence. *See Exum v. Washington Fire & Marine Ins. Co*., 297 S.W. 2d 805, 809 (Tenn. App. 1955).

Although Crants, Jr. seeks a judgment in this case on the basis of the October 2006 Release Agreement, it would be impossible, at this time, to conclude, as a matter of law, that the release is valid, despite the plaintiffs' economic coercion/duress argument. It is very well settled that, to prevail on a summary judgment motion, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Here, the factual support for the arguments on both sides of

---

[2] The October 2006 Release Agreement states that it is to "be governed by and construed in accordance with the laws of the State of Tennessee applicable to contracts made and to be performed therein." (Docket No. 152 Ex. 3 at 13.)

the economic coercion issue has not been developed at this stage in the litigation, and only

through further discovery can that factual support be gathered.  Crants, Jr's motion is premature,

and, therefore, the motion to dismiss on the basis of the release (which is actually a motion for

summary judgment) will be denied, without prejudice.[3]

> B.    Standing

Both Crants, Jr. and Crants, III assert that the plaintiffs do not have standing to assert

their RICO claims in this case, because the plaintiffs did not suffer a direct injury, as required for

RICO standing.  (Docket No. 151 at 11; Docket No. 157 at 6.)  The argument of these defendants

can be well summarized by the statement in Crants, Jr.'s brief that "HSC - not plaintiffs - is the

alleged injured party, and plaintiffs lack standing to bring these individual claims for injuries

allegedly suffered by a corporation."  (Docket No. 151 at 11.)  At this point in the litigation, this

is not a viable argument for either defendant.  (*Id.*)

RICO's civil suit provision grants "[a]ny person injured in his business or property by

reason of a violation of" RICO's substantive provisions the right to "sue [ ] in any appropriate

---

[3]A brief note on the failure of consideration argument is appropriate.  In support of this argument, the plaintiffs claim that the stock transfers from Crants, Jr., to the extent that they occurred, "gave [Mr.] Siddle no ownership interest in HSC" because, at the time of the transfers, Crants, Jr. had already "pledged all of his interest in those share[s] to First Tennessee bank," which was holding the stock as collateral on the dates that the April and October 2006 releases were signed, and, therefore, any stock certificates that Crants, Jr. provided to Mr. Siddle must have been fraudulent.  (Docket No. 165 at 3-4.)  In his reply, Crants, Jr. points out that the October 2006 release is effective "as of the Closing" (Docket No. 174 at 2), which took place at the end of October 2006, and First Tennessee, as the plaintiffs recognize and the records show, released Crants, Jr.'s HSC stock on October 27, 2006 in exchange for cash from Crants, Jr. (Docket No. 171 Ex. 2.)  Therefore, while the parties have a difficult time identifying the precise closing date and time, there is a strong indication that there was no lien on the stock at the time of the closing, and Crants, Jr. caused the release of the lien in order to give the stock over to Mr. Siddle.  Again, however, the factual record on this point is sparse, and, only through further discovery could the plaintiffs' claims be rebuffed as a matter of law.

14

United States district court" and to "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). There is no question, however, that, if the plaintiff in a RICO suit asserts an injury that is purely derivative of a corporate injury, that plaintiff would not have standing to sue under RICO for that injury. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004); *Warren v. Manuf. Nat'l Bank of Detroit*, 759 F.2d 542, 544-45 (6th Cir. 1985)(finding that, where the injuries were "apparently inflicted upon the corporation," the corporation's sole shareholder did not have the right to sue in an individual capacity under RICO for business losses and loss of employment); *Gaff v. FDIC*, 814 F.2d 311, 317 (6th Cir. 1987) ("We find that in *Warren* this Circuit conclusively adopted the general rule that a shareholder does not have standing to bring a direct cause of action under federal law when the only damage alleged is the diminution in the value of corporate shares.")

The Crants defendants argue that, because the Amended Complaint repeatedly alleges that the defendants drained cash from HSC and caused HSC certain damages, the plaintiffs' alleged injuries must be purely derivative of those suffered by HSC, and, therefore, the plaintiffs lack standing. (*See e.g.* Docket No. 151 at 12.) The defendants point out that the sum total of the damages that the plaintiffs seek in this case is almost exactly triple the amount that the plaintiffs have alleged that the defendants took from HSC ($41,761,464) in the course of their scheme, which, because RICO permits a treble damages recovery, would indicate that the plaintiffs did not suffer any damages on their own. (Docket No. 151 at 12; Docket No. 177 at 7.) That argument is not entirely correct, because, among other things, the plaintiffs' RICO Case Statement says that the "fraudulent and coercive schemes" caused harm "in excess" of that $41,761,464 amount. (Docket No. 139 at 26.)

15

The question, therefore, is whether, at this stage, taking the plaintiffs' Complaint allegations as true, the plaintiffs have sufficiently alleged that they suffered injuries independent of HSC. The plaintiffs' briefing in response to Crants, Jr.'s motion provides little support for this position, because the plaintiffs simply state that the "racketeering activities directly injured the plaintiffs," and then the plaintiffs go on to cite a series of cases that do not deal with the concept of RICO standing in the context of corporate injury. (Docket No. 165 at 18.) In response to Crants III's (largely identical) arguments on the standing issue, the plaintiffs argue that they are "persons who since 1986 [have] held business, property and honest services interests of over $100,000,000 in their credentials, past performance, clearances, clients, contracts, copyrights, patents, trademarks, and networks ... none of these valuable property interests belonged to HSC. They all belonged to the plaintiffs ... therefore when [the defendants'] racketeering activity harmed these interests, including the plaintiffs' interests in HSC, by stealing them, converting them to cash, and illegally transferring the cash ... [the defendants] directly harmed the plaintiffs." (Docket No. 168 at 9.)

That is, the plaintiffs argue, unlike in the Sixth Circuit cases cited above, the plaintiffs have suffered injuries independent of HSC. (*Id.*) Again, the plaintiffs do not cite any cases that are particularly helpful to their position on the "corporate standing" issue, as they cite a series of more recent cases that deal with the issue of demonstrating reliance in the RICO mail fraud context. These cases do not directly concern the corporate standing issue raised in *Warren* and other similar Sixth Circuit cases, and, therefore, they are not particularly helpful to the analysis here. (Docket No. 168 at 9, citing *e.g. Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008); *Chaz Concrete Co. v. Codell*, 545 F.3d 407 (6th Cir. 2008)).

16

While the plaintiffs do repeatedly mention injuries suffered by HSC, the Complaint and the plaintiffs' RICO Case Statement contain enough support for the proposition that the plaintiffs suffered injuries independent from HSC (personal, direct injury) such that the court, at this stage, cannot dismiss the RICO claims for lack of standing. For instance, in their Complaint and RICO Case Statement, the plaintiffs state that, among other things, the defendants' RICO violations cost them "business clients and business opportunities, security clearances, and past performance credentials," and also damaged their "financial accounts and credit" and "copyrights, patents, and trademarks." (Docket No. 6 at 42;-43; Docket No. 139 at 3.)

It is certainly reasonable to assume, in light of the allegations in the Complaint, that the scheme alleged could have directly injured individuals closely associated with the scheme and HSC in these respects. That is, among other things, such a scheme could have discredited individuals associated with HSC in certain circles to such an extent that the plaintiffs lost their "business clients and business opportunities, security clearances, and past performance credentials." (See Docket No. 6 at 43.) It appears that it is this type of injury, amongst others, that the plaintiffs are alleging here. This injury strikes the court as significantly more direct than the derivative injuries discussed in the Sixth Circuit case law noted above.

Further, both defendants' briefing is remarkably "light" on this discussion, with Crants, III merely stating that, "to the extent plaintiffs allege that Crants III improperly obtained any assets or other property interests in connection with an alleged RICO conspiracy, the Amended Complaint and other pleadings filed by plaintiffs reveal that those interests were owned by HSC not plaintiffs." (Docket No. 177 at 7.) The court, after reviewing those materials, does not believe that, at this stage, there can be any certainty on these issues, and, further, the plaintiffs

17

appear to be alleging not just the loss of assets that they may have turned over to HSC, but rather, that the defendants' scheme caused them personal and professional damage, because of their association with the scheme and with HSC.

Only further discovery can reveal whether the plaintiffs will be able to show any damages separate and apart from those suffered by HSC, and the court certainly will not foreclose the defendants from reasserting this standing argument at a later stage in the proceeding. Therefore, the court will not dismiss the Complaint against either defendant based on lack of standing, and the court now turns to the additional arguments made by Crants, III in support of his motion to dismiss.

## III.     Crants, III's Motion

After briefing the standing issue (discussed above), the remainder of Crants, III's motion argues that the plaintiffs have not sufficiently stated the claims against him.[4] As noted above, the claims against Crants, III are: (1) a claim of RICO conspiracy (Section 1962(d)), (2) unfair and deceptive conduct in violation of Illinois unfair and deceptive business practices statutes; (3) tortious interference with business relationships; (4) fraudulent misrepresentation; (5) unjust enrichment; (6) intentional spoliation; (7) conversion; (8) and civil conspiracy.

### A.     RICO

To be clear, as to Crants, III, the plaintiffs have only asserted a claim of RICO conspiracy under 18 U.S.C. § 1962(d), and, therefore, the showing that they must make as to Crants, III is

---

[4]Crants, III does, in a footnote, argue that, because he was "agent and representative" of Crants, Jr. and HSC, the release agreements bar claims against him as well. (Docket No. 157 at 4; Docket No. 177 at 3.) As indicated above, the enforceability of the release may only be fully addressed after discovery has been taken in this case.

different from the showing that they would have to make if they were asserting a substantive RICO claim against Crants, III under Section 1962(c). That is, to state the Section 1962(d) claim, the plaintiffs must sufficiently show that other defendants (co-conspirators) have committed substantive violations of RICO under Section 1962(c). *Schwartz v. One Equity Corp.*, 2008 WL 4425964, *4 (S.D. Ohio Sept. 25, 2008); *Salinas v. U.S.*, 522 U.S. 52, 65-66 (1997). If the plaintiffs can successfully show that a co-conspirator violated Section 1962(c), then, to establish Crants, III's liability under Section 1962(d), the plaintiffs only need to show that Crants, III agreed to further or facilitate the criminal endeavor by agreeing that someone, although not necessarily himself, "would commit two predicate acts." *U.S. v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).

To successfully plead a violation of Section 1962(c), the plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima SPRL v. Imrex Co.*, 473 U.S. 479, 496 (1985). A "pattern" of "racketeering" activity consists of the commission of at least two "predicate acts," as defined by Section 1961(1)(B) within a ten-year period of each other. *Schwartz*, 2008 WL 4425964, at *2. A "predicate act" is defined by Section 1961(1)(B) to be "any act which is indictable under any of the following provisions of Title 18 United States Code ..." (listing a long series of crimes, including mail fraud, wire fraud, and obstruction of justice). 18 U.S.C. § 1961(1)(B).

In his motion, Crants, III makes three arguments in support of his position that the plaintiffs have failed to state a Section 1962(d) claim against him. First, he argues that the "plaintiffs fail to plead specific facts showing that Crants III entered into a specific agreement with at least one other co-conspirator to commit acts that would constitute a substantive violation

19

of RICO." (Docket No. 157 at 11.) Indeed, Crants, III argues that the plaintiffs are required to "establish the existence of an agreement and its terms." (*Id.* at 12 citing *Goren*, 156 F.3d at 732.) Crants, III also points to a Sixth Circuit case from 1990, in which the court dismissed a Section 1962(d) claim because the plaintiffs had failed to plead a violation of Section 1962(c), and the court also noted that the Section 1962(d) claim "fails to plead the existence of an agreement to engage in conduct that would amount to a RICO violation. Thus, while plaintiffs have pleaded the conclusory allegation that the defendants 'conspired,' they have failed to plead the elements of a conspiracy." *Craighead v. E.F. Hutton*, 899 F.2d 485, 495 (6th Cir. 1990).

Here, particularly in light of the more recent case law, the court finds that the plaintiffs' pleading as to the relevant agreements is more than adequate. That is, the plaintiffs have clearly pled that Crants, III agreed to further or facilitate the criminal endeavor by agreeing that someone "would commit two predicate acts." *Driver*, 535 F.3d at 432. For instance, as noted above, the Complaint alleges that Crants, III agreed that he and his father would commit mail, wire and bank fraud (racketeering activities). Specifically, the Complaint alleges that, in a continuing manner from April 2002 to October 2006 "Crants, III and Crants [Jr] ... agreed to misrepresent to the public, including the Siddles and federally insured banks, that HSC had issued a Convertible Demand Promissory Note for $5,000,000 payable to [a Related Party] without any written agreement or resolution regarding the demand note in HSC's books." (Docket No. 6 at 4-5, 9.)

In a similar vein, the Complaint also alleges that, on or about September 19, 2006, Crants, Jr. and Crants, III agreed to create and publish a fraudulent document that, while purporting to pay a Related Party more than $2,800,000 for debts HSC owed the entity, was

20

actually a vehicle to drain money from HSC and cover up additional fraudulent transactions. (Docket No. 6 at 32-33.)  Also, the plaintiffs allege that Crants, Jr. and Crants III worked together over time to obstruct justice through transferring assets and destroying documents. (Docket No. 6 at 13.)  Other predicate acts and agreements are indicated in the Complaint, including those involving the predicate acts of extortion and receipt of stolen property.  (Docket No. 6 at 13-16.).

Therefore, even accepting the more demanding standard of some courts that have required that such agreements be pled with "specificity," the plaintiffs have been quite specific about the agreements here.  *See Lachmund v. ADM Investor Servs, Inc.*, 191 F.3d at 777, 785 (7th Cir. 1999).  It is clear from the Complaint that, at certain specific points in the scheme, Crants,, Jr and Crants, III agreed that certain, specific predicate acts would be done, and the details behind those acts are fully revealed, particularly as to the transactions with the Related Party entities discussed above.  Therefore, the argument that the plaintiffs have not been specific enough as to the agreements at issue is without merit.

Second, Crants, III argues that "plaintiffs fail to plead facts which show that Crants III conducted or participated in the affairs of a RICO enterprise as required by Section 1962(c), the substantive RICO provision that plaintiffs allege Crants III conspired to violate."   (Docket No. 157 at 12.)  The cases that Crants, III cites make it clear that this "conduct" requirement relates to Section 1962(c), which, again, it is not a requirement for Crants, III to have violated in order for him to be liable under Section 1962(d).  *See Goren*, 156 F.3d 726-27; *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993).   Therefore, the argument that Crants, III's Section 1962(c) "conduct" was somehow insufficient for liability under Section 1962(d) is misplaced and without

21

merit.[5]

Finally, Crants, III argues that the "amended Complaint also fails to show that Crants III engaged in a pattern of racketeering activity [and] ... committed predicate acts." (Docket No. 157 at 14.) Again, as should be clear by this point, it is not necessary for the plaintiffs to plead that Crants, III himself committed predicate acts, only that he agreed that somebody else would commit predicate acts in furtherance of the criminal enterprise. As discussed above, the plaintiffs have sufficiently pled that those agreements were made.

To the extent that Crants, III argues that the plaintiffs have not alleged that other defendants engaged in a "pattern" of "racketeering activity" by committing two predicate acts, the court disagrees. For instance, one predicate act is mail or wire fraud. 18 U.S.C. § 1961(1)(B). To state a claim for mail or wire fraud, a plaintiff must show that "(1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails [or wires] ... in furtherance of the scheme and (3) the defendants did so with the specific intent to deceive or defraud." *Central Distributors of Beer, Inc. v. Conn.*, 5 F.3d 181, 184 (6th Cir. 1993). The circumstances of the fraud must be stated with "particularity," that is, providing the defendant with "fair notice" of the pertinent allegations, particularly as to the "time, place,

---

[5] Crants, III also argues that the plaintiffs have failed to plead facts that show HSC was a RICO enterprise. (Docket No. 157 at 13.) A RICO enterprise is a defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." 18 U.S.C. § 1961(4). HSC, which was an incorporated business, clearly qualifies. *United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006) ("The hallmark of an enterprise is structure ... there must be some structure to distinguish an enterprise from a mere conspiracy, but there need not be much. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise.")(internal citation and quotation omitted)

22

and content" of the relevant misrepresentations, along with specific information on the fraudulent scheme, the fraudulent intent, and resulting injuries. *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999).

Here, throughout the Amended Complaint, the plaintiffs have put the defendants on "fair notice" of the precise nature of, among other things, their mail and wire fraud claims. Indeed, as to the "Related Party" agreements discussed above between Crants, Jr. and Crants, III., the plaintiffs have alleged that, at specific moments in time, these defendants had a fraudulent scheme of a specific nature that undoubtedly required the use of the mails and wires to carry out. As indicated above, the allegations put the defendants on notice as to when the misrepresentations occurred, how they occurred, how they furthered the scheme and intent of the defendants, and how they injured HSC and the plaintiffs. Therefore, even to the extent that Crants, III was attempting to argue that a Section 1962(c) claim was not stated in the Complaint, this argument is without merit. Therefore, Crants III's motion to dismiss the RICO conspiracy claim will be denied.[6]

**B.      State Law Claims**

---

[6] Crants, III also notes that RICO has a four-year statute of limitations, dating from the time that the plaintiffs were put on inquiry notice. *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 399 (6th Cir. 1999). Crants, III then concludes that "plaintiffs cannot rely on those acts that allegedly occurred prior to September 30, 2004, to state a claim against Crants III under RICO." (Docket No. 157 at 15.) Crants, III makes no effort to show why September 30, 2004 (which is four years before the plaintiffs' initial Complaint was filed) is automatically the date of inquiry notice in all circumstances, even though the plaintiffs have alleged that they were not informed of the embezzlement until 2005 and that many of the details of the fraudulent scheme were hidden from the plaintiffs until after the October 2006 stock sale. In sum, Crants III's statute of limitations argument is full of assumptions from a record that has not been built yet; again, there may be a time for a statute of limitations argument in this case, but it is premature at this point.

Case 3:09-cv-00175   Document 180   Filed 06/18/09   Page 23 of 26 PageID #: 2204

Crants, III also moves to dismiss the state law claims that the plaintiffs assert against him. This issue has not been effectively briefed by either side, and, therefore, before the court can rule on this issue, further briefing will be required.

By way of review, while this case was still before the Southern District of Illinois, Crants, III moved to dismiss all claims under Rule 12(b)(6) for failure to state a claim. (Docket No. 55.) The plaintiffs responded to that motion, arguing, amongst other things, that their Illinois statutory and common law claims were viable. (Docket No. 81.) After this case was transferred, Crants, III's motion to dismiss for failure to state a claim was termed on the docket (Docket 109), but, because the Rule 12(b)(6) motions were not resolved by the transfer of this case under 28 U.S.C. § 1406, Crants, III filed a new motion to dismiss all claims for failure to state a claim. (Docket No. 156.) As discussed above, that motion will be denied as to the RICO claim against Crants, III.

As to the state law claims, however, Crants, III's pending motion to dismiss makes the assumption that Tennessee law now governs all of the plaintiffs' state law causes of action, including the Illinois statutory causes of action; that is, Crants, III argues that all of the plaintiffs' common law claims (including, for instance, the misrepresentation, conversion, and unjust enrichment claims) are now governed by Tennessee law, and, moreover, that the plaintiffs' claims against Crants, III under the Illinois Unfair Business Practices and Deceptive Trade Practices Acts somehow become claims under Tennessee Consumer Protection Act, even though the plaintiffs have never asserted a claim under that Act. (Docket No. 157 at 17.) The only support that Crants, III appears to provide for this conversion is the *GBJ Corp.* case, which only holds that, when a case is transferred under Section 1406(a), the choice of law rules of the

24

transferee court apply. *GBJ Corp. v. E. Ohio Paving Corp.*, 139 F.3d 1080, 1084 (6th Cir. 1998). The court hardly views this case as conclusive support for the argument made here by Crants, III, particularly because that case expressly distinguishes choice of law doctrine from the rules governing the application of substantive law. *Id.*

That said, in their response brief, the plaintiffs do not even discuss the state law claims, let alone how, if it all, the transfer of this case has affected those claims. Rather, the plaintiffs only state that "plaintiffs incorporate by reference their Response to Crants, III's First Rule 12(b)(6) Motion to Dismiss (DE 77)." (Docket No. 168 at 20.) Docket Entry 77 is a response to a venue motion. Docket Entry 81, however, is the plaintiffs' response to Crants, III's original motion to dismiss for failure to state a claim, and that response does defend the state law claims against dismissal, doing so, of course, based on Illinois law. (Docket No. 81 at 16-19.)

Therefore, on this briefing, the court cannot grant or deny Crants III's motion to dismiss as to the state law claims. Crants, III appears to be making assumptions (without providing sufficient support) as to the law that applies to those claims and also attempting to unilaterally convert claims in the plaintiffs' Complaint, and the plaintiffs, instead of objecting or responding to that, refer the court to a previous filing without any explanation.

Therefore, this matter will proceed as follows: the court will issue an order denying Crants Jr's motion to dismiss, and denying Crants, III's motion to dismiss as to the RICO claim. If, in light of that ruling, Crants, III wishes to proceed with discovery, he may certainly do so and renew his challenges to all claims on summary judgment. If, on the other hand, Crants, III seeks to renew his attempt to dismiss the state law claims, he must file a new motion to dismiss (directed only to the state law claims) by the deadline to be set at the initial case management

25

conference. In that new motion, Crants, III must identify (1) what underlying substantive law applies and why and (2) why that substantive law counsels for the dismissal of the plaintiffs' claims. Any attempt to convert the plaintiffs' claims in this case must be fully and clearly explained. In response, the plaintiffs must address Crants, III's argument as to what substantive law applies and how that law affects the plaintiffs' claims here.

## CONCLUSION

For the reasons discussed herein, Crants, Jr's Motion to Dismiss will be denied, and Crants, III's Motion to Dismiss as to the RICO claim will be denied. The court cannot rule on the state law claims against Crants, III as presently briefed, and, therefore, consistent with the discussion above, if Crants, III desires to renew his Motion to Dismiss as to the state law claims, he must file a new Motion to Dismiss as to those claims by a deadline to be set by the court.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge