## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRUCE K. SIDDLE and SANDRA K.** | ) | |
| **SIDDLE, individually and as trustees of the** | ) | |
| **Bruce K. Siddle and Sandra K. Siddle trusts,** | ) | |
| **dated July 16, 2003, and PPCT** | ) | |
| **MANAGEMENT SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:09-0175** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **DOCTOR R. CRANTS, JR., DOCTOR R.** | ) | |
| **CRANTS, III, LINDA COOPER,** | ) | |
| **GEORGE V. CRAWFORD, III, LEE F.** | ) | |
| **BOOTH, and ROY W. OAKS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Pending before the court are Motions for Summary Judgment filed by defendants Doctor R. Crants, Jr. ("Crants") and Doctor R. Crants, III ("Crants III"). (Docket Nos. 219 and 224.) Also pending are three additional motions filed by Crants III: (1) a Motion to Dismiss Plaintiffs' State Law Claims and Newly-Pled Federal Law Claims, (2) a Motion to Strike the Declaration of Bruce K. Siddle, and (3) a Motion to Exclude Matters Outside the Complaint and Record Included in Plaintiffs' Response to [Crants III's] Motion to Dismiss. (Docket Nos. 216, 272 and 275, respectively.) Because the "release" argument advanced by Crants and Crants III (collectively, "the Crants defendants") in their summary judgment motions is dispositive in their favor, the summary judgment motions will be granted, and, as it is not necessary to reach these latter three motions, they will be denied as moot.

1

## FACTUAL AND PROCEDURAL BACKGROUND

As discussed in the court's June 18, 2009 Memorandum that ruled on the Crants defendants' motions to dismiss, this case primarily centers on a complicated and dense dispute between former business partners at the Homeland Security Corporation (HSC), plaintiff Bruce Siddle and defendant Crants.[1] (*See* Docket No. 180.) HSC, among other things, competed for government contracts such as those offered by the Transportation Security Administration (TSA) to assist in the training of TSA employees on new security protocols in place following the September 11, 2001 terrorist attacks.

In December 2001, HSC entered into a joint venture with PPCT Management Systems (a plaintiff in this case). Plaintiff Bruce Siddle ran PPCT at this time and owned 100 percent of the stock in the company. (Docket No. 201 at 9.) The joint venture was formed to compete for a

---

[1]Unless otherwise noted, the facts are drawn from the Crants defendants' statements of material facts, the plaintiffs' responses, (Docket Nos. 221, 226, 263, and 264) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). In addition to the more traditional, and rule compliant, statements of material facts cited above, the plaintiffs have filed an 83-page "Statement of Additional Material Facts and Declaration of Bruce K. Siddle," along with various attached exhibits. (Docket No. 254.) In addition to moving to strike this document for various reasons, Crants III has attempted to address the allegations and statements in that document by filing a 158-page reply, which, in the style of a typical response to a statement of material facts, responds to each allegation or statement seriatim. (Docket No. 271.) The plaintiff's filing, which largely restates the allegations in the Second Amended Complaint and only occasionally, and often vaguely, cites to documents in the record, clearly runs afoul of the Local Rules, which, among other things, only provide for the non-moving party to assert additional facts when responding to the moving party's statement of material facts. L.R. 56.01(c)-(d). That said, and recognizing Crants III's argument that, as a declaration, the document is flawed, the court has reviewed the plaintiff's filing and attached exhibits for information that might raise or illuminate a material fact that exists as to the Crants defendants' release arguments. As discussed herein, no such material fact exists.

2

$106,000,000 TSA contract, which was awarded to the joint venture in April 2002. After the contract was awarded, the joint venture dissolved when Mr. Siddle agreed to transfer his interest in PPCT to HSC in exchange for certain consideration from HSC, including the title of "President" of HSC, a seat on the HSC Board of Directors, cash, and an annual salary for himself and his wife, Sandra, from HSC. (Docket No. 227 Ex. 4.) PPCT is now a wholly owned subsidiary of HSC. (Docket No. 10.) HSC initially issued 1,000,000 shares of stock, with 750,000 going to Crants and 250,000 going to the Siddles. (*See* Docket No. 254 at 11.) In 2003, Crants' son, defendant Crants III, through Crants, acquired five percent ownership of HSC. (Docket No. 201 at 11.)

Beyond this, there is little about which the parties agree. The plaintiffs contend that Crants, allegedly in financial trouble due to pressing loans and bad business decisions, sought out Siddle, a use-of-force training expert, for the purposes of unfairly exploiting Siddle's knowledge and dishonestly making money to pay off Crants' various loans. (*See generally* Docket No. 201 and 254.) As discussed in the court's earlier Memorandum, in addition to the general allegation that the Crants defendants used HSC as an "ATM" for their personal needs, the plaintiffs allege that there were several specific schemes entered into by the Crants defendants to defraud Siddle, HSC shareholders, banks, and the public, including the "demand note" scheme, the "stock redemption" scheme, and the "Fraudulent Factoring for Hidden Related Party Payments Device." (Docket No. 180 at 3.) These alleged schemes and devices, many of which involved entities also owned or controlled by the Crants defendants, were discussed at length in the previous Memorandum, and, as can be seen herein, it is not necessary to further elaborate on the complex allegations here. While the Crants defendants' argument in this round

3

of briefing is not primarily directed at the merits of the Complaint allegations, they claim that these "schemes" and "devices" were above board and Siddle was well aware of them. (*See* Docket No. 220 at 17.)

It is undisputed that the relationship between Siddle and Crants completely deteriorated through the years and that, in 2005, Siddle became concerned about financial mismanagement and impropriety at HSC. (Docket No. 254 at 52.) Indeed, throughout the course of this litigation, the plaintiffs have alleged that, "in Spring or Summer of 2005," Siddle was informed by HSC's Chief Financial Officer that Crants was embezzling money, concealing financial information, and using HSC money for private transactions. (*Id.*)

The parties also agree that, in late 2005, Siddle retained the law firm of Baker, Donelson, Bearman, Caldwell, & Berkowitz ("Baker Donelson") to investigate the general financial situation at HSC and to investigate certain specific financial transactions, including those with other entities controlled by the Crants defendants. On December 19, 2005, Siddle's attorneys at Baker Donelson sent a lengthy request to HSC, seeking a wide variety of financial information from the company, including information relating to the "demand note" scheme and the "stock redemption" scheme. The next day HSC responded, through its counsel, that it would be "more than happy" to provide access to corporate records and financial information for Siddle. Through correspondence over the course of the next several months, counsel for Siddle made additional requests for information and counsel for HSC attempted to explain the rationale for the questioned transactions and to provide documents that would also address Siddle's concerns. From the balance of this correspondence, it does not appear that Siddle or his counsel were ever completely satisfied with the explanations provided by HSC's counsel. (*See* Docket No. 228

4

Exs. 1-9.)

Despite this, on April 6, 2006, after the final piece of this correspondence between counsel was exchanged, HSC, Crants, and Siddle entered into a "Mutual Release and Settlement Agreement" ("the April Agreement"). (Docket No. 227 Ex. 27.) The stated purpose of the April Agreement was to "mutually releas[e] and settl[e] all claims" between Siddle and Crants. (*Id.*) Additionally, the April Agreement provides that Crants will give 40,000 shares of his HSC stock to each of the Siddle Trusts (80,000 shares total). (*Id.*) Also, Siddle purported to "remise[], release[], and forever discharge[] Crants and HSC, jointly and severally, and its and their managers, directors, officers, employees, shareholders, agents, representatives, attorneys, and certified public accountants, from any and all actions, claims and demands which he may have arising from any act, inaction, error, omission, damage, breach, default, right, duty or obligation that may have existed or occurred prior to the date of this Agreement, whether such actions, claims and demands are currently known or unknown, disclosed or undisclosed, or are accrued or unaccrued." (*Id.*) HSC and Crants similarly released all such claims against Siddle (and his associates) and each other (and each other's associates). (*Id.*)

The April Agreement goes on to clarify its scope. That is, it states that "[t]he undersigned agree and warrant that this Agreement may be pled as a complete bar and defense to any action or other proceeding which may be instituted on account of any of the matters contained herein. . . . and that it will have the effect of barring any future claims, demands, or causes of action on account of any matters set forth herein, and it is with this understanding that the undersigned execute this document." (*Id.*)

As discussed in the previous Memorandum, the acrimony between Siddle and Crants

5

continued through the summer of 2006, and a plan eventually emerged for Siddle and HSC to buy Crants' HSC stock and thereby terminate Crants' relationship with HSC. (Docket No. 180 at 5.) Consistent with this, on October 3, 2006, Siddle, Crants, and Joseph Johnson, Jr. (the other member of the HSC Board of Directors at the time) entered into a Stock Purchase Agreement (the "SPA"). (Docket No. 227 Ex. 32.) According to the terms of the SPA, Crants promised to deliver his 579,848 shares of HSC stock to Siddle and Johnson in exchange for about $5 million in cash and promissory notes, to be paid out over time. (*Id.*)

The SPA also contained a release, by which Siddle again agreed to release Crants and "his agents, representatives, attorneys, and certified public accountants, from any and all actions, claims and demands" arising from "any act, inaction, error, omission, damage, breach, default, right, duty, or obligation that may have existed or occurred prior to the date of this Agreement . . . whether such actions, claims and demands are currently known or unknown, disclosed or undisclosed, or are accrued or unaccrued." (*Id.*) Again, HSC and Crants also made the same release of Siddle and his associates. (*Id.*)

The defendants contend that they abided by the terms of both the April Agreement and the SPA. Specifically, Crants, while arguing that the April Agreement also operates to bar the plaintiffs' claims here, focuses on the events surrounding the SPA. (*See* Docket No. 220 at 1.) Providing documentary evidence to support each of his claims, Crants argues that, on October 3, 2006, Crants, Siddle, and Johnson agreed to the SPA in principle, and, then, over the next month, conducted the business necessary to close the deal. (*Id.* at 4.) For instance, on October 23, 2006, the HSC Board, which included Siddle, voted unanimously to approve the SPA as "in the best interests of [HSC]." (Docket No. 222 Ex. 2.)

6

Following this approval, the Board obtained the financing necessary to purchase Crants' shares, a step that included Siddle's executing and delivering an Officer's Certificate to Baker Donelson, which Baker Donelson would use to certify to the financing bank (Alpha Bank) that there was no known "fraud, duress or undue influence" relating to the transactions surrounding the loan. (Docket No. 222 Ex. 3.) After Baker Donelson sent this opinion letter to Alpha Bank, on Siddle's request, Alpha Bank disbursed the funds necessary to pay Crants. (Docket No. 222 Ex. 4.) Crants then used this money to pay off a lien on his HSC stock held by First Tennessee Bank. (Docket No. 222 at 2-3.) The Crants defendants contend that, after it received Crants' payment, First Tennessee released the lien on Crants' shares and Siddle/HSC received the shares, as dictated by the SPA. (*Id.*; Docket No. 165 Ex. 1; Docket No. 227 Ex. 38.)

Crants III argues that the April Agreement is also fully enforceable. That is, prior to entering into the release therein, Crants had 659,848 shares of HSC stock, which, admittedly, First Tennessee Bank held a lien upon. (Docket No. 225 at 8; Docket No. 227 Ex. 18.) Crants III argues that the record conclusively demonstrates that, at the time that the April Agreement was signed, Crants' stock certificate representing his 659,848 shares was cancelled, and new certificates were issued, that is, two 40,000 stock certificates for the Siddle Trusts and a 579,848 certificate to represent Crants' remaining shares. (Docket No. 227 Exs. 18, 28-30.) Crants III also supports the factual account of the events surrounding the SPA that is provided by Crants. (Docket No. 225 at 9-10.)

In light of all of this, the Crants defendants argue that all shares of stock were delivered consistent with the terms of the agreements, and that the releases are fully enforceable. Therefore, they argue, this action against the Crants defendants, no matter the complexity of the

allegations or the variety of the claims, should be dismissed in its entirety. As discussed below, the plaintiffs raise a few challenges to the release argument, but they primarily argue that the defendants' fraudulent schemes extended to the drafting of phony or meaningless stock certificates, and, consistent with this, any stock that was used to pay off the plaintiffs under the release agreements was not valid consideration. (*See* Docket No. 256 at 4; Docket No. 257 at 4.) Specifically, the plaintiffs' argument largely focuses on the fact that First Tennessee Bank held a lien on Crants' shares of HSC stock for the vast majority of the relevant time period, and, therefore, any purported transfer of those shares pursuant to the release agreements could not be valid. (*Id.*)

**ANALYSIS**

In this round of briefing, the Crants defendants claim that they fully performed under the agreements discussed above, that the releases therein operate to bar the plaintiffs' claims against them, and, that, therefore, they should be dismissed from this lawsuit. The plaintiffs argue that, for several reasons, the releases do not operate to bar the claims.

## I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.

8

2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Crants' Motion

Crants correctly argues that, absent a valid defense to the enforcement of the release agreement, the broad language of the release contained in the SPA would release Crants from "any and all claims . . . that Siddle had as of the consummation of his purchase of Crants' stock." (Docket No. 220 at 7.) Indeed, absent proof of fraud, duress or some other defense to enforceability, a contractual release of claims will be enforced in Tennessee consistent with the parties' intent as stated in the relevant agreement.[2] *See Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004); *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997). Indeed, as to releases, Tennessee law calls for broad enforcement of their plain terms. That is, "a

---

[2] The SPA states that it is to "be governed by and construed in accordance with the laws of the State of Tennessee applicable to contracts made and to be performed therein." (Docket No. Docket No. 227 Ex. 32 at 13.) The April Agreement has a provision stating that the parties "submit to the exclusive jurisdiction and venue" of Tennessee courts. (Docket No. 227 Ex. 27 at 2.)

9

release is a contract and rules of construction applied to contracts are used in construing a release.  The cardinal rule is to ascertain the intention of the parties.  A general release covers all claims between the parties which are in existence and within their contemplation."
*Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 560 (Tenn. Ct. App. 1991).

Additionally, Crants argues that the defenses to enforcement offered by the plaintiffs throughout this litigation – duress, lack of consideration, and fraud – all fail on the record developed in preparation for summary judgment briefing.  (Docket No. 220 at 8.)

### A.     Duress

As discussed in the prior Memorandum, the plaintiffs, throughout this litigation, have maintained that Siddle only signed the SPA under conditions of economic duress.  (Docket No. 180 at 12.)  To avoid a contract on the grounds of economic duress, the party seeking to avoid the agreement must show by "clear, cogent and convincing" evidence that the agreement came about through "imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another. " *Crocker v. Schneider*, 683 S.W.2d 335, 338 (Tenn. Ct. App. 1984)(internal quotation omitted); *Exum v. Washington Fire & Marine Ins. Co*., 297 S.W. 2d 805, 809 (Tenn. Ct. App. 1955).  Indeed, whether the pressure is physical or economic, "duress in the legal sense only exists when one by the unlawful act of another is induced to make a contract or perform some other act which deprives him of the exercise of free will," that is, the pressure imposed denies the victim any sense of freedom in making the decision to contract.  *Holloway v. Evers*, 2007 WL 4322128, *9 (Tenn. Ct. App. Dec. 6, 2007)(internal quotation and citation omitted).

Crants argues that the supposed methods of economic duress referred to by the plaintiffs

10

in their Complaint and in earlier briefing, such as the withholding of salary or threats to bankrupt/liquidate HSC, are unsupported by the record. (Docket No. 220 at 10.) Indeed, the Second Amended Complaint suggests that Crants withheld the salary of Siddle and his wife for two months to compel Mr. Siddle to sign the SPA, but W-2s and checks filed by Crants in support of his motion here demonstrate that the Siddles were paid in full and, essentially, on time, in 2006, despite significant economic turmoil at HSC throughout that year. (Docket No. 223 Exs. A-C.)

Moreover, Crants argues that, despite the development of a thorough record, there is no evidence other than "self-serving allegations in the Complaint" that Crants threatened to bankrupt HSC or to liquidate its assets if Siddle failed to sign the SPA. (Docket No. 220 at 10-12.) Indeed, the record from this time period shows Siddle taking affirmative steps, inconsistent with any duress, to close the SPA. As discussed above, Siddle was part of the unanimous HSC Board vote to approve the SPA as "advisable and in the best interests of [HSC]," and Siddle also delivered the Officer's Certificate to his counsel at Baker Donelson for use in obtaining financing to purchase Crants' shares. (Docket No. 222 Exs. 2-3.)

Also, Crants argues, even if there were evidence in the record of economic coercion or duress, the SPA would still be enforceable because Siddle ratified it. (Docket No. 220 at 12.) That is, because a contract signed under economic duress in Tennessee is "voidable" and not "void," courts have held that the party seeking to avoid the coerced contract "must act promptly" to void the contract and may "ratif[y] the release" by failing to act quickly to avoid its terms. *Cumberland & Ohio Co. v. First Am. Nat'l Bank*, 936 F.2d 846, 850 (6th Cir. 1991). Here, Crants argues, even though Crants (the alleged source of the coercion) left HSC after the closing

11

of the SPA on October 27, 2006, Siddle did nothing to avoid the SPA following his departure, thereby ratifying the agreement. (Docket No. 220 at 13.) Indeed, Crants filed several documents that indicate that HSC paid Crants under the SPA and that Siddle, in the year after the SPA was signed, entered into at least two contracts that recognized either the existence of the SPA (by modifying its payment terms) or his "free and clear" ownership of HSC stock. (Docket No. 222 Exs. 5, 6, 24.) Therefore, Crants argues that, even if the SPA was signed under economic duress, Siddle ratified the agreement and waived the duress defense.

In response, the plaintiffs state that they have "produce[d] credible evidence that in April and October of 2006, Crants and Crants III threatened to destroy Bruce K. Siddle and his family economically if he did not sign those documents." (Docket No. 256 at 11.) That is, "Crants [] threatened to remove Bruce from the Board and discharge all of his family, put HSC at or near bankruptcy, and destroy his reputation and business." (*Id.*) The plaintiffs provide no citation to the record in making these statements and, on the court's review, there is certainly no "clear, cogent and convincing" evidence of economic duress. At most, the record reflects that Crants, on two occasions, months prior to the signing or closing of the SPA, called a meeting of the HSC Board to consider Siddle's removal from that Board and, on both occasions, Crants cancelled or ended the meeting without the Board's taking any action. (Docket No. 269 Exs. 6-9.) As Crants argues in his Reply, "Plaintiffs offer no reasonable explanation . . . why valid shareholders meetings that were cancelled months before he agreed to the release so deprived Siddle of free will as to constitute duress under Tennessee law." (Docket No. 268 at 6.) Simply put, on this

12

record, duress is not a viable response to the release defense here.[3]

## B.    Fraudulent Inducement

Crants also argues, at some length, that "Plaintiffs' defense of fraud in the formation of the Stock Purchase Agreement fails as a matter of law."  (Docket No. 220 at 14.)  That is, while the Second Amended Complaint is littered with allegations of fraud and deceit by the defendants, the plaintiffs have not shown how Siddle was specifically fraudulently induced into signing the SPA.  For instance, there is no specific allegation of any misrepresentation that reasonably induced Siddle to sign the SPA.  (*Id.* at 15.)  Rather, for several months at the end of 2005 and the start of 2006, Siddle's counsel thoroughly investigated the financial situation at HSC, and Siddle was well aware that Crants had been accused by others at HSC of mismanaging the company's finances and entering into specific, fraudulent "related party" schemes; yet, Siddle signed the release anyway.  (*Id.* at 14-21.)

In their response, the plaintiffs do not address this specific argument; although, at one point, they conclusively state that the releases were "induced by fraud." (Docket No. 256 at 2.). On this record, then, the allegation of fraudulent inducement is not a viable method for the plaintiffs to avoid the releases.

## B.    Failure of Consideration

_____

[3]At one point in his 83-page declaration/statement of additional material facts, Siddle denies signing the contracts that Crants claims are evidence of ratification.  (Docket No. 254 at 81.)  Such a claim is entirely inconsistent with the tenor of the record and is otherwise unsupported.  Indeed, Crants provides an e-mail sent by one of Siddle's attorneys at Baker Donelson to Crants' counsel that acknowledges that Siddle signed the agreement modifying the SPA payment terms.  (Docket No. 269 Ex. 2.)  Moreover, even if there were evidence to support a forgery, there is still no question that Siddle did not file this litigation for almost two years after the supposed duress abated, and, therefore, he did not act "quickly" to avoid ratifying the contract as required by Tennessee law.

13

Crants also argues that all parties received the full consideration provided for in the SPA. (Docket No. 220 at 21.) That is, along with mutual releases of all claims, Siddle received all of Crants' remaining shares in HSC, and that, while these shares may have been pledged to First Tennessee as collateral to secure a debt, the record clearly demonstrates that, by the October 27, 2006 closing of the SPA, Crants had taken all necessary steps to pay off that debt, the lien on the shares was released and Siddle owned the shares free and clear. (Docket No. 165 Ex. 1; Docket No. 227 Ex. 38.) Crants argues that this record is further supported by the documentation and Siddle's representations following the closing, discussed above, in which Siddle recognized the validity of the SPA and indicated that he owned his shares "free and clear."

The plaintiffs strongly challenge the notion that the SPA was supported by consideration. (Docket No. 256 at 1.) Again, the starting point for the plaintiffs' argument is that Crants had pledged his HSC shares to First Tennessee Bank in 2003, and, therefore, any transfers of that stock, including the 80,000 shares supposedly transferred pursuant to the April Agreement, could not have been valid. (*Id.* at 4.) Moreover, the plaintiffs argue that "Crants [] produces no evidence of a single valid HSC stock certificate he signed over to Siddle or Johnson," numerous stock certificates were fabricated through the years, and disputed issues of fact exist as to whether there was ever a transfer of stock ownership and, therefore, whether the SPA is enforceable. (*Id.* at 4-7.)

Crants convincingly addresses these, ultimately misleading, arguments in his Reply. For instance, it is clear from the record that, in October 2006, Siddle signed an "Assignment and Assumption Agreement," in which he assigned his rights under the SPA to HSC, and then HSC, through Siddle, authorized Alpha Bank to pay Crants, who then paid First Tennessee to release

14

the lien on the shares. (Docket No. 269 Ex. 3; Docket No. 222 Ex. 4; Docket No. 165 Ex. 1.)

Other documentation, the authenticity of which is not reasonably disputed, shows that Crants

transferred his shares to HSC, pursuant to the SPA, via a signed writing. (Docket No. 227 Ex.

38.) Finally, additional documentation indicates that, very shortly after these shares were

received by HSC, the Company decided to cancel the outstanding shares of stock and reissue the

1,000,000 shares, with 300,000 shares going to the Siddle Family Trusts, 100,000 going to

Johnson, and the remainder going to other investors. (Docket No. 227 Exs. 38-39.)

Furthermore, even if the evidence was not so clear on the stock transfer issue,

consideration was still provided for the SPA. For instance, the record reflects that Siddle

received a $1.16 million, no interest, loan from Crants to fund the buy-out of Crants, a loan that

was secured by the 400,000 shares of stock that HSC reissued immediately after Crants sold his

stock back to HSC. (Docket No. 269 Exs. 4-5.) Through the SPA, Siddle also received the

assurance that he would not be sued by the other contracting parties, and Tennessee courts have

held that such mutual promises of claim forbearance constitute consideration valid to support a

contract. *Rodgers v. Southern Newspapers, Inc.*, 379 S.W.2d 797, 800 (Tenn. 1964); *Mifsud v.*

*Dominion Bank of Middle Tenn.*, 1993 WL 477012, *6 (Tenn. Ct. App. Nov. 17, 1993). For all

of these reasons, it is clear that failure of consideration is not a valid response to the release

defense here.[4]

---

[4]Finally, Crants notes that some of the allegations in the plaintiffs' 115-page Second
Amended Complaint deal with conduct of various defendants that occurred after October 27,
2006. (Docket No. 220 at 22.) For instance, as to the RICO claims, the plaintiffs allege that
Crants "caused" others to file fraudulent court documents in this litigation. (Docket 201 at 30.)
Not only is this allegation vague, it is unsupported by the record that has been developed in this
case, and the plaintiffs, in this round of briefing, provide no further discussion, argument or
evidence in support of these bare allegations. The RICO Case Statement claims that Crants

15

**III.    Crants III's Motion**

As discussed above, Crants III also argues that all claims against him should be dismissed because of the release agreements. (Docket No. 225 at 11.) Indeed, Crants III largely relies on the April Agreement and points to the language of that Agreement that releases Crants, HSC, and their "shareholders, agents, [and] representatives" from all claims that would be asserted by Siddle. (Docket No. 227 Ex. 27.) Crants III argues that, consistent with his ownership of 5 percent of HSC and with the Complaint allegations that Crants III operated as an agent/representative of HSC and Crants, he falls within the group of individuals and entities released from Siddle's claims through the April Agreement. (Docket No. 225 at 13-17.)

Moreover, consistent with the discussion above, Crants III argues that the April Agreement is fully enforceable. That is, it was the product of substantial negotiations between the parties, was only signed after substantial investigation into Crants' activities by Siddle, and was supported by the consideration of mutual releases and by the 80,000 shares of stock that were given by Crants to the Siddles. (*Id.*) Additionally, to the extent that any of the Complaint allegations implicate his behavior between the April Agreement and the SPA, Crants III points

_____

(through "Related Parties") "corruptly tried to influence" a 2007 case proceeding in the District Court for the Northern District of West Virginia by naming Lee Booth, another defendant in this case, as a witness and that, in 2008, Crants filed a fraudulent declaration in this case. (Docket No. 139 at 4, 10, 17.) Again, the plaintiffs make no attempt to prove these bare allegations, or to show how, in light of the release agreements, these bare allegations would be sufficient to sustain a cause of action. Also, the plaintiffs repeatedly refer to the relationship between Siddle and Crants as being a "fiduciary" relationship, suggesting that Crants somehow violated duties to Siddle in the course of negotiating the SPA. (See Docket No. 256 at 3.) The record, however, demonstrates that the SPA was generated through arms' length negotiations and that all sides were represented by able counsel. Moreover, as Crants points out, even if the SPA were the result of an abuse of power by Crants, the SPA, as discussed above, would be voidable and not void, and Siddle did not move quickly to void the contract. (Docket No. 268 at 11.)

16

out that the SPA also releases "agents" and "representatives" of Crants, and, therefore, the SPA would operate to release any claims that arose in that intervening time period. (*Id.* at 17; Docket No. 227 Ex. 32.)

In response, the plaintiffs primarily argue that there was no consideration for the April Agreement because the 80,000 shares at issue were already pledged to First Tennessee, and, therefore, the plaintiffs claim, the stock certificates were "not worth the paper on which they were written." (Docket No. 257 at 3.) Again, there is no dispute that Crants pledged his shares to First Tennessee in January 2003, and that, at the time of the April Agreement, those shares were still pledged to First Tennessee. The plaintiffs contend that this fact renders the April Agreement unenforceable. (*Id.* at 4-5.) The plaintiffs also claim that Crants' failure to divulge the pledged nature of the shares to Siddle prior to the closing of the April Agreement amounts to fraud in the inducement, which also voids the April Agreement. (*Id.* at 5.) The plaintiffs spend the remainder of their brief arguing that the general releases should not apply to claims (such as those under RICO) that the plaintiffs only recently discovered, because those claims were not in the parties' contemplation at the time the releases were signed. That is, "[a]lthough Bruce K. Siddle knew that some wrongdoing was going on with the defendants and HSC, he was not aware of all of his claims." (*Id.* at 9.)

### A. Consideration

Crants III has the better of the argument here. First, as he points out, no matter the effect of the stock pledge, the April Agreement was still supported by consideration. As discussed above, mutual promises, including mutual promises of claim forbearance, are sufficient consideration to support a contract under Tennessee law. *Rodgers,* 379 S.W. 2d at 800; *Mifsud,*

17

1993 WL 477012 at *6. Additionally, while the stocks may have been pledged at the time of the April Agreement, the lien on the stocks was released as of October 2006, and, therefore, this consideration, even if delayed, was eventually realized.

Moreover, the stocks could still act as valuable consideration despite the pledge to First Tennessee. Under Tennessee law, "the general rule is that under a pledge agreement, the pledgee does not acquire title to the property pledged as collateral. The pledgee acquires only a special property in the collateral with the right to sell upon default. . . . The absolute title to the collateral is not divested out of the pledgor until foreclosure or a sale upon proper notice to the pledgor." *Trimble v. Sonitrol of Memphis, Inc.*, 723 S.W. 2d 633, 638 (Tenn. Ct. App. 1986). Additionally, in his reply, Crants III convincingly argues that, if any dispute had ever arisen, a court would have concluded that the Siddles owned the stock free and clear of the lien, because they gave value for the security and took without notice of the lien. (Docket No. 270 at 10)(citing T.C.A. § 47-8-302(a); T.C.A. § 47-8-303(a)-(b))

Therefore, the record clearly establishes that, while the stocks at issue in the April Agreement were subject to a lien at the time of that Agreement, consideration for the April Agreement does not fail as a result. Therefore, the plaintiffs cannot avoid the April Agreement on the grounds of failure of consideration. Additionally, for the reasons discussed above, the SPA was also supported by consideration, and, therefore, lack of consideration is not a viable method for the plaintiffs to avoid the effects of the release agreements as to Crants III.

### B.    Fraudulent Inducement

As discussed above, the plaintiffs claim that they were induced into the April Agreement by fraud, that is, Crants never revealed that the 80,000 shares were pledged to First Tennessee,

18

and, therefore, they should be able to avoid the release contained in that Agreement. (Docket No. 257 at 5.) Typically, a claim that a party is entitled to relief based on the fraudulent conduct of another requires a showing, among other things, that the other party knowingly or intentionally made a false material promise or false statement of material fact, reliance on the statement was present and reasonable, and that the party relying on the statement was injured thereby. *See Styles v. Blackwood,* 2008 WL 5396804, *6-7 (Tenn. Ct. App. Dec. 29, 2008). A party seeking to avoid or rescind a contract based on a claim of fraud must show the fraudulent or deceptive conduct by "clear and convincing evidence." *Id.*

The plaintiffs' fraud argument is not sustainable. The plaintiffs provide no evidence that Crants ever lied about the pledged nature of the stocks or provide anything more than the conclusory statement that Crants had a "fiduciary" duty to disclose the pledge to Siddle. (Docket No. 257 at 5.) Moreover, there is no indication of any reliance by the plaintiffs on any such misrepresentation, and there is also no evidence of damages caused by this specific, alleged fraud. Indeed, because it is undisputed that the lien on the stocks was released prior to any dispute about ownership, there is no evidence that the plaintiffs would have suffered any damages, which is a requirement for maintaining an argument based on fraud. *Styles,* 2008 WL 5396804, *6-7.

### C.     The General Nature of the Releases

Little need be said on this point. Clearly, the unambiguous intent of both the April Agreement and the SPA was to permanently end the prospect of litigation between Siddle, Crants, HSC, and associated entities. Therefore, all claims for damages arising out of the alleged financial malfeasance at issue were within the contemplation of the parties at the time that the

19

releases were entered into. Under Tennessee law, the fact that Siddle was unaware that he might have a RICO claim at the time he signed the releases is not the point. It is clear from the plain language of the releases that the parties intended to short-circuit all future litigation between them for conduct that occurred prior to October 27, 2006, however the claims in that litigation would have been expressed. Therefore, all such claims are barred here.

## VI. Remaining Plaintiffs

As is clear from the discussion above, Bruce Siddle may not maintain the claims asserted in this litigation against the Crants defendants because of the release agreements. That is, he is a signatory to the release agreements, those agreements are enforceable, and they include the claims asserted here. The remaining issue is whether the other named plaintiffs, that is, the Siddle Trusts, PPCT, and Sandra Siddle, who are not signatories to the release agreements may maintain claims against the Crants defendants based upon the Second Amended Complaint. The court concludes that they may not.

Tennessee courts have previously addressed whether a release agreement may cover a party closely connected to, but not explicitly mentioned in, the agreement, and have concluded that such parties may be covered. Again, in interpreting a release agreement, "the cardinal rule is to ascertain the intention of the parties" and a general release "covers all claims between the parties that are in existence and within" the contemplation of the parties at the time of the agreement. *Burks*, 958 S.W.2d at 776. Therefore, even if the "literal wording" of the release agreement does not "specifically name[]" a certain entity that is closely related to or controlled by a releasing party, that entity may still be covered by the release, if such a release is clearly within the contemplation of the parties. *Id.* at 776-77 (finding that the explicit release of a trade

20

name used by a "non-incorporated business entity" that was owned by the defendants was sufficient to release the defendants, even though they were not explicitly named in the release).

Here, it was clearly the intent of the signatories to release not just themselves, but also entities that they controlled. This intent can be seen through the strength of the April Agreement, that is, "it will have the effect of barring any future claims, demands, or causes of action on account of any matters set forth herein, and it is with this understanding that the undersigned execute this document." (Docket No. 227 Ex. 27.) Also, all signatories broadly released all claims that they might have against not only the other signatories, but entities, representatives and agents associated with or under the control of the other signatories. Indeed, at one point, the SPA explicitly refers to Siddle "and his affiliates" as the purchaser in the transaction and then goes on to define "affiliate" as an entity under the control of the individual specified. (Docket No. 227 Ex. 32 at 1.) Therefore, it was clearly *not* the intent of the parties to have the claims that a signatory could assert absent the release agreements survive to be asserted by an entity that was controlled by the party who released the claims. Therefore, to the extent that independent claims of PPCT (which is controlled by signatories to the release agreements) and the Siddle Trusts exist here, the release agreements operate to bar those claims. Indeed, the plaintiffs do not substantively challenge this point in briefing.[5]

The plaintiffs do, however, argue that Sandra Siddle's claims are not barred by the releases, because she was not a signatory to the agreements, and "Defendants fail to show that Mrs. Siddle even knew of the agreements before they were signed." (Docket No. 256 at 9.) The

_____

[5] Moreover, from the Complaint, it is not clear what independent claims would be asserted by the Siddle Trusts, other than claims for diminished stock value, which, as discussed below, would not be viable.

plaintiffs go on to cite a series of cases from other jurisdictions, apparently for the proposition that a party cannot be held to a contract of which he was unaware or did not sign. (*Id.*)(citing, among others, *Electroplated Metal Solutions, Inc. v. Am. Servs., Inc.*, 500 F. Supp. 2d 974, 977 (N.D. Ill. 2007)).

In response, the Crants defendants point out that, even if the release agreements do not bind Mrs. Siddle, despite the nearly 200 pages of allegations filed by the plaintiffs (the Second Amended Complaint and the declaration/statement of material facts), there exist no "particularized allegations involving Sandra K. Siddle" and no "cognizable, individual claims by Sandra Siddle." (Docket No. 220 at 23; Docket No. 268 at 12-13.) Indeed, while the Second Amended Complaint frequently refers to conduct generally directed at the "plaintiffs," the more specific allegations make it clear that Mr. Siddle, due to his position on the HSC Board of Directors and his close association with Crants, was the primary target of any deception. (*See* Docket No. 201 at 9, 25-28, 53.) Where the Complaint does explicitly mention Mrs. Siddle, it is in the context of her ownership of HSC stock or in the context of her employment at HSC. (*Id.* at 9, 37, 40-42.)

Indeed, as the Crants defendants point out, under the Second Amended Complaint, the only plausible areas of damages (other than withheld salary or emotional distress, which are entirely unsupported by the record) that Mrs. Siddle could have against the Crants defendants is a claim for the reduced value of her HSC stock. (Docket No. 225 at 13.) It is well settled that such a claim (for damage to the value of the corporation) would be owned, in the first instance, by HSC, which released its claims through the April Agreement and the SPA. (Docket No. 227 Ex. 27, 32; *see also Lewis on Behalf of Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215,

221 (Tenn. Ct. App. 1992); *Wright v. Dunn*, 315 Fed. Appx. 552, 553 (6th Cir. 2009)). While certain procedures exist that allow a shareholder to pursue a derivative suit in the absence of corporate action to defend its interests, there is no indication that Mrs. Siddle, or any named plaintiff, has complied with the requirements of pursuing such a suit or even attempts to pursue such a claim here. *See id.*

Therefore, the Crants defendants are entitled to dismissal of the claims asserted in the Second Amended Complaint by all of the named plaintiffs in this case.

## CONCLUSION

For the reasons discussed herein, the motions for summary judgment filed by the Crants defendants will be granted, and the Crants defendants will be dismissed from this case.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23